No. 04-640

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 62

ROBBIE PRINDEL,

Plaintiff and Appellant,

v.

RAVALLI COUNTY,

Defendant and Respondent.

APPEAL FROM:     The District Court of the Twenty-First Judicial District,
In and For the County Ravalli, Cause No. DV 2001-50,
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Rex Palmer, Attorneys, Inc., Missoula, Montana

For Respondent:

Dee Ann G. Cooney and Norman H. Grosfield, Utick & Grosfield,
Helena, Montana

Submitted on Briefs:  January 11, 2006

Decided:  April 4, 2006

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Robbie Prindel (Prindel), who was stabbed by Richard Russell (Russell) on December 30, 1998, sued Ravalli County, alleging that the county was negligent when, on December 28, 1998, it failed to admit Russell to the Ravalli County Jail pursuant to a district court order. Both parties moved for summary judgment, and the District Court granted summary judgment in favor of Ravalli County, concluding that as a matter of law the County did not have a duty to prevent Russell from harming Prindel. The District Court declined to order release of various documents to Prindel and held that Prindel is not entitled to discovery of other documents. Prindel now appeals, and we reverse.

¶2 Prindel raises the following issues on appeal:

¶3 (1) whether the District Court erred when it held that Ravalli County owed no duty of care to Prindel;

¶4 (2) whether the District Court erred when it declined to order release of records pertaining to Russell compiled or possessed by the Missoula Pre-Release Center; and

¶5 (3) whether the District Court erred when it failed to compel production of the Ravalli County Attorney's files concerning Russell.

### FACTUAL AND PROCEDURAL BACKGROUND

¶6 On the evening of December 29, 1998, a group of revelers gathered at a private residence[1] in Hamilton, Montana, to celebrate the year's crepuscular remnants. Russell and Prindel both attended the soiree. The partygoers imbibed spirits well into the night.

---

[1]The residence where this party took place is located within ten blocks of the Ravalli County Jail.

The party, not to be contained within a single day, spilled over into the early morning of December 30, 1998, whereupon violence tragically pierced the revelry. Russell stabbed Prindel in the heart with a six-inch knife, inflicting life-threatening injury and permanently impairing Prindel.

¶7  In connection with this stabbing, Russell was convicted of attempted deliberate homicide and sentenced to life in prison with an additional ten years for the use of a deadly weapon. Subsequently, Prindel filed a complaint against Ravalli County alleging that the county jail's failure to incarcerate Russell on December 28, 1998, despite a district court order that Russell begin serving a sentence on that date, amounted to negligence that proximately caused Prindel's injury.

¶8  During a hearing on December 23, 1998, Russell, who had previously received three suspended sentences and had been released subject to certain conditions, admitted to violating those conditions. Specifically, Russell admitted to consuming alcohol and engaging in disorderly conduct. The District Court for the Twenty-First Judicial District in Ravalli County revoked Russell's suspended sentences and ordered him to serve ten days in the Ravalli County Jail (the Jail). In a gesture of generosity befitting the spirit of the season and acceding to Russell's wish to spend Christmas unconfined, the District Court ordered him to report to the Jail "no later than 8:00 a.m. on [Monday,] December 28, 1998." When Russell showed up at the Jail, however, the jailers turned him away.

¶9  Russell reported to the Jail at 10:00 a.m. on December 28, 1998, to begin serving his sentence. He spoke with Heather Anderson (Anderson), who was on duty at the Jail,

by telephone from the Jail lobby. Anderson could not find a written order of commitment from the court mandating the Jail to admit Russell. She informed Russell that he could not be booked until the Jail had the requisite paperwork and instructed him to return on January 2, 1999. Anderson did not place a call to the Ravalli County Clerk of Court (Clerk) to inquire whether there was an order mandating Russell's commitment. Nor does the evidence indicate that she requested that Russell go to the Clerk's office (located in the same building as the jail), procure the court's written order and return. Before informing Russell that he should return several days later, Anderson apparently spoke with Jason McCawley (McCawley), another staff member of the Jail, about a prior incident when Russell had attempted, unsuccessfully, to gain unauthorized entry to the Jail in order to harm an inmate. According to Anderson's deposition testimony, her knowledge of this previous incident played "[a] small part" in her decision to turn Russell away. According to McCawley, he was familiar with Russell, having seen Russell make threatening gestures to another inmate during one of his prior stints in the Jail.

¶10    Russell called the Jail again at 3:00 p.m. on December 28, 1998, seeking admission to serve his sentence. He was reminded that he should return to the Jail on January 2, 1999, to serve his sentence.

¶11    Anderson and McCawley both testified that it was not uncommon for a person to report to the Jail without the requisite paperwork and that, time permitting, the Jail would call the Clerk to confirm that the court had ordered such persons incarcerated. Moreover, Anderson testified that the Clerk could fax the order of commitment to the Jail within

4

twenty or thirty minutes. McCawley testified that he called the Clerk after turning Russell away and that he could have called the Clerk before deciding not to admit Russell. David Anderson, the third person on duty at the Jail on December 28, testified that he would have sent a purported prisoner who was lacking commitment papers to "go get" the court order. He also indicated that he "probably would . . . contact" the Clerk to verify that the court had ordered incarceration. Finally, both McCawley and Anderson testified that the Clerk's office called the Jail at some undetermined time on the afternoon of December 28, 1998, to confirm that the District Court had ordered Russell to serve time in the Jail.

¶12 No stranger to institutional living, Russell had an extensive criminal history. In 1981, Russell was sentenced to ten years in prison in connection with four felonies: two counts of theft; attempted escape; and bail jumping. In 1987, Russell pled guilty to burglary. By the mid-nineties, Russell had allegedly delved into the world of violent crime. He was arrested in 1995 and charged with felony aggravated assault and again arrested in 1996 and charged with domestic abuse.

¶13 In December 1997, Russell's proclivity for criminal behavior resurfaced, eventually culminating in his being sentenced to serve ten days in the Jail in December 1998. He was arrested and charged with two counts of felony assault, stemming from an incident when he allegedly fired a pistol into the air in a residential neighborhood while threatening to kill his neighbor and her barking dogs. Russell, who was allegedly intoxicated at the time, claimed that he had only fired a "cap gun," not a lethal pistol.

5

Russell eventually pled guilty to two counts of misdemeanor assault in connection with this incident and was sentenced to concurrent sentences of 180 days in prison, with 150 days suspended. In November 1998, the State filed a petition for revocation of Russell's suspended sentence. The hearing of December 23, 1998, whence the District Court ordered Russell to serve ten days commencing on December 28, 1998, addressed this petition.

¶14    As alluded to above, Prindel filed suit against Ravalli County asserting a claim of negligence. Both parties moved for summary judgment. The County asserted that Prindel failed to establish that it had a duty to incarcerate Russell or prevent him from harming Prindel. The County also denied that its failure to imprison Russell caused Prindel's injuries. The County additionally asserted the defense of judicial immunity. Prindel retorted that the County waived the affirmative defenses of superseding intervening cause, public duty doctrine, and judicial immunity by its failure to plead them.

¶15    The District Court denied Prindel's motion for summary judgment and granted summary judgment in favor of Ravalli County. In its order, the District Court stated that a "duty to protect another from harm" may arise where there is a "special relationship [that] is 'custodial by nature,' thus requiring the defendant to exercise reasonable control over his or her charge so as to prevent foreseeable harm to others." The court also acknowledged that in analyzing foreseeability in the duty context, the determinative question is whether the injured party was a foreseeable plaintiff. The court stressed that

6

Russell was sentenced to prison in December 1998 because he had violated conditions of his suspended sentence for *misdemeanor* convictions. The court then detailed the process that generally occurs after it convicts a person on misdemeanor charges. The court order emphasizes that, consistent with local district court rules, the Clerk has two business days to file the minute entry with the jail ordering a person's incarceration. Here, the Clerk had until the end of December 28, 1998, to file the minute entry. The court suggests that "[d]ue to the absence of any documentation of Russell's sentence, due to the holiday in the midst of the two business days in which the minute entry was required to be prepared, due to the fact that the staff was shorthanded that Monday following the three-day weekend, and due to an unusually hectic day, Russell's date to begin his sentence was rescheduled by the jail staff" and that this rescheduling was an "understandable result of [these] circumstances . . . ."

¶16    The District Court determined that during the early morning hours of December 30, 1998, the County (by and through the Jail staff) did not have a special custodial relationship to Russell that would give rise to a duty to prevent him from inflicting harm on third persons, for the simple reason that the Jail had not physically taken Russell into custody. "The jail staff properly did not believe they had authority to admit Russell to the jail, so they made alternative arrangements . . . ." Judge Langton concluded that "[i]t is not reasonably foreseeable that the failure of the jail staff to take a person (Russell) who voluntarily presented himself at jail to serve a ten-day misdemeanor probation violation sentence for non-violent activity is likely to cause an unreasonable risk of harm

7

to Prindel (a person Russell barely knew)." Judge Langton observed that "[t]here was nothing on the morning of December 28 to indicate that Russell would go out into the world and exhibit violent behavior." Consequently, he determined that "Prindel has failed to show that the County had a legal duty to protect him from Russell [so] Prindel's negligence claim against the County must fail."

¶17 During discovery, Prindel obtained a copy of the presentence investigation report that was prepared after Russell was convicted of attempted deliberate homicide. Prindel claims that this report states that Russell was "booted out of the Missoula Pre-Release Center." Prindel subsequently filed a motion requesting that the court order the release of all information compiled or possessed at any time by the Missoula Pre-Release Center. Prindel argued that this information may be relevant or lead to the discovery of relevant evidence concerning what the County knew or should have known about Russell on December 28, 1998. The County objected that the information held by another county at some indeterminate prior time is not relevant to the issue of what the County knew or should have known about Russell, nor will it lead to relevant information. The court denied Prindel's motion, reasoning that "this information was not within the purview of the jail staff (and most likely not in the purview of the County) . . . and therefore could not have a bearing on the foreseeability of Russell's act of violence against Prindel." Prindel argues that the District Court abused its discretion when it denied his request for access to these files.

¶18     In addition, Prindel filed two motions requesting that the District Court order the Ravalli County Attorney's Office to provide Prindel with its files containing information concerning Russell.  Pursuant to § 44-5-303, MCA, the first motion sought disclosure by the County Attorney's Office of criminal justice information concerning Russell contained in its files, but excluding attorney work product and other privileged information. The County did not object to this motion.  On December 24, 2003, the District Court ordered the Ravalli County Attorney to produce a "copy of any and all criminal justice information compiled on Richard Leroy Russell prior to December 28, 1998 [excluding attorney work product and other privileged information.]"  The parties then filed a joint motion, indicating that "the initial Order was unduly limited and Plaintiff will need additional information concerning Richard Russell to properly prepare his case."  Accordingly, on February 18, 2004, the District Court found "*to the extent applicable*, pursuant to § 44-5-303, MCA, . . . the demands of individual privacy do not clearly exceed the merits of public disclosure" (emphasis added) and ordered the Ravalli County Attorney to produce "[a]ll files and records concerning Richard Russell" within twenty days.[2]  On March 31, 2004 (more than forty days later), having received a portion of the requested records, along with a letter from the County Attorney refusing to fully comply with the court orders, Prindel moved the District Court to compel compliance with the court's previous orders.  Prindel argued that any work product privilege claimed by the County Attorney is undermined by the fact that the criminal case is closed and the

---

[2]This order also ordered other law enforcement agencies to release various criminal justice information.

documents requested are relevant to a pending civil case. The County argued that the joint motion covered only criminal justice information, as defined by § 44-5-103(8), MCA, but did not cover the County Attorney's notes reflecting his thoughts about the investigation and Russell's case. Prindel notes that the County Attorney, a named witness for the defense, though twice ordered to produce these documents, never appealed this order, nor sought a protective order, nor followed any other statutorily delineated procedure to protect against discovery of these documents. Instead, on June 21, 2004, the County filed notice that the County Attorney's office submitted its files for *in camera* review. After reviewing the County Attorney's files, including "letters, notes, phone messages, memos, etc.," the District Court determined that "[t]he only evidence that raised a flag was a paragraph in a letter" that the County Attorney wrote to an officer of the Crime Victim Compensation Program in 1999. In that letter, the County Attorney wrote, "[Richard Russell] has a long criminal history of violence. . . . I prosecuted [Russell] for 2 counts of felony assault last year, where he threatened neighboring women with a gun, firing it off a dozen times, yelling threats all the while. A threat with a knife was involved in that case." In declining to order these files released to Prindel, the District Court reasoned that this letter "is colored by hindsight," and so presumably would not be relevant to the County's knowledge of Russell prior to the stabbing. Prindel contends that the County's failure to produce these documents pursuant to the court order violated Rule 37(d), M.R.Civ.P.

**STANDARDS OF REVIEW**

¶19   We review a district court's grant of summary judgment *de novo*, applying Rule 56, M.R.Civ.P. *Lopez v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, ¶ 16, 295 Mont. 416, ¶ 16, 986 P.2d 1081, ¶ 16. Summary judgment should be granted only when there is an absence of genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. The party seeking summary judgment bears the burden of initially establishing the complete absence of a genuine issue of material fact. *LaTray v. City of Havre*, 2000 MT 119, ¶ 14, 299 Mont. 449, ¶ 14, 999 P.2d 1010, ¶ 14. Only after the moving party has satisfied this requirement does the burden shift to the non-moving party to "show by more than mere denial, speculation, or conclusory statements, that a genuine issue of material fact exists." *LaTray*, ¶ 14. In evaluating a motion for summary judgment, "the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment." *Lopez*, ¶ 16.

¶20   "Ordinarily, questions of negligence are poorly suited to adjudication by summary judgment and are better left for jury determination at trial." *LaTray*, ¶ 15. Nevertheless, the existence of a legal duty is a matter of law properly determined by the court. *Nautilus Ins. v. First National Ins.* (1992), 254 Mont. 296, 299, 837 P.2d 409, 411.

¶21   We review a district court's order denying discovery to determine whether the district court abused its discretion. *Marriage of Caras* (1994), 263 Mont. 377, 384, 868 P.2d 615, 619. "A court abuses its discretion if it acts arbitrarily without employment of

11

conscientious judgment or exceed[s] the bounds of reason resulting in substantial injustice." *McDermott v. Carie*, 2005 MT 293, ¶ 10, 329 Mont. 295, ¶ 10, 124 P.3d 168, ¶ 10 (quotations and citation omitted, alteration in original).

## DISCUSSION

*Issue 1: Whether the District Court erred when it held that Ravalli County owed no duty of care to Prindel.*

¶22 Prindel argues that the District Court erroneously determined that the County had no duty to protect him from Russell and thus erred in granting summary judgment in favor of the County. Prindel contends that the County had a statutorily imposed duty to incarcerate Russell and it failed to take reasonable measures to confirm that he had been committed to the Jail by competent authority. Prindel avers that the County's failure to confine Russell, as required by statute, constitutes evidence of negligence as well as negligence *per se* and he notes that the District Court failed to even address these statutory arguments. Prindel maintains that the County had custody of Russell from the moment that he reported to the Jail to begin serving his sentence and that he—a person in the immediate vicinity of the Jail—was a foreseeable plaintiff; therefore, the County owed Prindel a duty of reasonable care under *Lopez*. Under the circumstances, Prindel suggests, the standard of reasonable care obliged the Jail to inquire into the veracity of Russell's claim that he had been ordered by the Court to serve time in prison. Prindel asserts that the District Court erroneously overlooked the fact that our prior holdings do not require that the government have actual custody of a person before a duty arises, but

12

merely the authority or ability to control the person who causes injury. Prindel stresses that if this Court requires the County to have physical custody of a person before it owes a duty to protect the public from that person, then the County could not be held liable even if it had possessed a court's commitment order when it turned Russell away. In addition, Prindel suggests that the District Court relied on a number of improper factual determinations to support its conclusion that the County had no duty to protect him from Russell. Prindel urges that policy considerations support the imposition of a duty of care on the County because the County's conduct is morally culpable and the imposition of a duty would prevent future harm to the public while placing only a minimal burden on the County. Finally, Prindel contends that the County has failed to properly present to this Court its argument that the public duty doctrine precludes the imposition of a duty and argues that even if the County has presented this issue, the public duty doctrine should be considered an affirmative defense that the County waived by failing to plead.

¶23　The County contends that the District Court properly determined that the County did not owe a duty of reasonable care toward Prindel. The County suggests that the District Court properly determined that statutes cited by Prindel—which do not specify a class of protected persons, but are general in nature—did not give rise to a duty in the absence of commitment papers from the court. The County maintains that it never took custody of Russell because without the commitment papers, it had no legal power to incarcerate him. Though exceedingly vague as to the specific theory it relies upon, the County's argument rests on either the latent implication that the public duty doctrine

13

shields it from liability because Russell was not in actual custody, or our observation that "'a person is not liable for the actions of another and is under no duty to protect another from harm in the absence of a *special relationship of custody or control*.'" *Lopez*, ¶ 24 (quoting *Krieg v. Massey* (1989), 239 Mont. 469, 472, 781 P.2d 277, 279) (emphasis in *Lopez*). In addition to denying the existence of a custodial relationship with Russell, the County insists that the foreseeability required to give rise to a duty was lacking because the Jail staff had no basis for anticipating Russell's violent outburst. The staff did not have access to Russell's extensive criminal record and he appeared to serve "mittimus" time, indicating that he had committed a misdemeanor and was not considered particularly dangerous by the court.

¶24 Finally, the County, without actually setting forth any substantive argument in its brief and instead referring this Court to its brief in support of summary judgment before the District Court, argues that judicial immunity shields it from liability and that it is entitled to summary judgment on grounds of causation and comparative negligence. We do not condone this practice of incorporating arguments by reference and thus will not consider the question of judicial immunity or whether the County is entitled to summary judgment on the basis of comparative negligence. After determining that the County did not owe Prindel a legal duty, the District Court indicated that "there is no need to address the causation issue." Our ruling herein will require the District Court to address the causation issue on remand. In this case, the factual underpinnings required to establish foreseeability in the respective contexts of duty and causation are inextricably

14

intertwined. Therefore, we briefly discuss the issue of foreseeability in the context of causation.

## A. Additional Arguments Not Addressed:

¶25　It is difficult to ascertain from the County's brief on appeal whether the County intends to argue that the County owed no duty to Prindel because of the effect of the public duty doctrine, *see, e.g., Nelson v. Driscoll*, 1999 MT 193, ¶¶ 21-22, 295 Mont. 363, ¶¶ 21-22, 983 P.2d 972, ¶¶ 21-22, or because of the general rule that "in the absence of a *special relationship of custody or control*," "there is no duty to protect others against harm from third persons," *Lopez*, ¶ 24 (citations and quotations omitted) (emphasis in *Lopez*). Although the County argued on the basis of the public duty doctrine in its brief in support of its motion for summary judgment at the District Court level, it does not cite any authority concerning the public duty doctrine in its brief on appeal.[3] Nor does it explicitly raise the public duty doctrine as a defense. Therefore, we will not address the public duty doctrine. *See* Rules 23(a)(4), 23(b), M.R.App.P. ("[t]he argument shall contain the contentions of the [respondent] with respect to the issues presented, and the reasons therefor, with citations to the authorities . . . relied on"). Because we decline to address the applicability of the public duty doctrine, we need not resolve the question, raised by Prindel, of whether the public duty doctrine is an affirmative defense. Since the

---

[3]The County cites to *LaTray* but only in order to argue that the District Court understood its nature and meaning. Although *LaTray* makes passing reference to the public duty doctrine, ¶ 19, the District Court never mentioned the doctrine in discussing *LaTray*, and we do not consider a mere citation to *LaTray* sufficient to properly present the issue to this Court.

County does cite to *Lopez* and *LaTray*, both of which discuss a "special relationship of custody," we presume that the County's argument concerning the absence of a common law duty is premised on the principle that we articulated in *Lopez.*

¶26    An obvious similarity exists between the principle articulated and applied in *Lopez* and *LaTray* and the public duty doctrine, which recognizes that a court may impose a duty on a government agency which has "actual custody of the plaintiff or of a third person who causes harm to the plaintiff." *Nelson*, ¶ 22. In the future, when the issue has been properly briefed, it may be appropriate for this Court to weave these parallel strands of authority together. For now, however, they remain but theoretically bound by the common thread of a custodial relationship as a prerequisite to the imposition of a duty.

¶27    We also decline to address Prindel's argument that the County's violation of § 7-32-2205, MCA (requiring a jail to admit persons committed by competent authority), constitutes negligence *per se*. In order to establish negligence *per se*, a plaintiff must prove that:

> (1) the defendant violated the particular statute; (2) the statute was enacted to protect a specific class of persons; (3) the plaintiff is a member of that class; (4) the plaintiff's injury is of the sort the statute was enacted to prevent; and (5) the statute was intended to regulate members of defendant's class.

*Schwabe v. Custer's Inn Associates*, 2000 MT 325, ¶ 23, 303 Mont. 15, ¶ 23, 15 P.3d 903, ¶ 23. Here, Prindel's complaint clearly alleges that the County owed a duty to Prindel, that it breached that duty, that its breach caused Prindel to suffer an injury, and that Prindel has sustained compensable damages. Thus, Prindel has alleged the elements

16

of common law negligence.  *See, e.g.*, *Henricksen v. State*, 2004 MT 20, ¶ 20, 319 Mont. 307, ¶ 20, 84 P.3d 38, ¶ 20.  Prindel's complaint does not, however, allege any of the elements of an action for negligence *per se*.  Consequently, he has not preserved this argument for appeal.

¶28  We will, however, consider Prindel's argument that the County's violation of the statute is evidence of negligence.  Logically, this would mean that the statute provides evidence of the existence of a duty and that violation of that statute is evidence of a breach of that duty.  Thus, here, we need only consider whether the statute indicates that the County owed a duty of reasonable care to Prindel.

## B.  Statutory Duty:

¶29  Under Montana law, it is well established that a duty may arise from a statutorily imposed obligation.  *See, e.g., Gibby v. Noranda Minerals Corp.* (1995), 273 Mont. 420, 427-28, 905 P.2d 126, 130-31 (holding that an employer owed a duty of care to its employee under a statute); *Jackson v. State*, 1998 MT 46, ¶¶ 62, 74, 287 Mont. 473, ¶¶ 62, 74, 956 P.2d 35, ¶¶ 62, 74 (noting that "[i]t is axiomatic that applicable statutes may create a duty in a negligence action," and concluding that the statute at issue imposes a duty); *Rookhuizen v. Blain's Mobile Home, Inc.* (1989), 236 Mont. 7, 10, 767 P.2d 1331, 1333 (noting that a duty may be established by statute); *Massee v. Thompson*, 2004 MT 121, ¶¶ 33, 43-45, 321 Mont. 210, ¶¶ 33, 43-45, 90 P.3d 394, ¶¶ 33, 43-45 (noting that a statute can give rise to a special duty for purposes of common law negligence and observing that "even if a violation of a statute does not constitute negligence *per se*, such

17

violation may nonetheless be considered as evidence of negligence"). Prindel asserts that the County owed him a duty of care on the basis of § 7-32-2205, MCA, which mandates that "[t]he detention center administrator *shall receive all persons committed to the detention center by competent authority* and provide them with necessary food, clothing, and bedding." (Emphasis added.) Moreover, "a prisoner convicted must be actually confined in the detention center until he is legally discharged." Section 7-32-2208, MCA. The statutes thus mandate that a detention center receive and confine a prisoner who is convicted by competent authority until he or she is discharged by equally competent authority. The determinative question then becomes, what constitutes "competent authority"?

¶30 The parties agree that if the Jail had possessed a written copy of the District Court's order of December 23, 1998, this would have qualified as "competent authority" committing Russell to the detention center. Essentially, the County suggests that if the Jail did not possess the actual written order, then Russell had not been committed to the Jail by competent authority. This argument is without merit. The authority of the District Court's order does not hinge on the Jail's actual possession of physical documentation of that order. "[T]he oral pronouncement of a criminal sentence is the legally effective sentence." *State v. Wiedrich*, 2005 MT 127, ¶ 11, 327 Mont. 214, ¶ 11, 112 P.3d 1054, ¶ 11 (citing *State v. Lane*, 1998 MT 76, 288 Mont. 286, 957 P.2d 9 (holding that when there is a conflict between an orally pronounced sentence and its written manifestation, the oral pronouncement controls)). In other words, the oral

18

pronouncement of a criminal sentence provides the competent authority by which to incarcerate a defendant.

¶31     Although the Jail had not received notice of the court order via official channels (i.e., from the Clerk), we attribute this communication breakdown to either the office of the Clerk (which apparently failed to transmit documentation of the commitment order to the Jail by the time that Russell was due to report to the Jail), or to the Jail (which may have misplaced or neglected to retrieve the commitment order from the Jail's mail box in the Clerk's office).  In either case, the failure of transmittal was due to the conduct of an agent of Ravalli County.

¶32     Due to the County's internal communication breakdown, the Jail's staff was unaware of the court order committing Russell.  Nevertheless, when Russell appeared and reported to Anderson that he had been ordered by the court to begin serving a sentence, the Jail had constructive notice of the District Court's commitment order.  A copy of the minute entry documenting the order could easily have been obtained by the Jail if its staff had expended even minimal effort to verify that the court had ordered Russell imprisoned at that time.  As suggested by David Anderson, the Jail staff could have called the Clerk's office or they could have requested that Russell go to the Clerk's office, located in the same building, to retrieve a copy of his commitment papers.  Instead, the Jail staff unilaterally rescheduled Russell's sentence.  The Jail's ignorance of the court's order of commitment does not diminish the order's status as "competent authority" to commit

19

Russell. Nor does the dilatory transmittal of the written order to the Jail by the Clerk.[4]

To rule otherwise would give unilateral power to the Jail staff or to the Clerk to override court orders by mere inaction. The courts' authority is not so tenuous. The court order of December 23, 1998, provided competent authority for the Jail to admit Russell. The Jail staff and the Clerk lacked legal authority to unilaterally discharge Russell. The Jail staff likewise lacked legal authority to decline to take custody of Russell when ordered to do so by the court. Consequently, the statutory provisions quoted above evidence the existence of the Jail's duty to take Russell into custody for the protection of the surrounding public.

¶33    In its order granting summary judgment in favor of the County, the District Court emphasizes that pursuant to Rule 2(H) of the Montana Twenty-First Judicial District Court Rules (1993), the Clerk of Court had until the close of business on December 28, 1998, to transmit the minute entry documenting the court's commitment order to the Jail. By its explicit terms, however, this rule governs only service of minute entries on counsel and merely establishes that such service must occur "within two business days of the date any case is heard." Rule 2(H), Montana Twenty-First Judicial District Court Rules (1993). Unlike counsel who are in attendance at the hearing and do not need immediate written confirmation of the court order, the Jail staff does not normally have notice of the court's commitment order until actual receipt of the minute entry. It is reasonable to

---

[4]Indeed, the Clerk who ought to have prepared the minute entry documenting the court's order of commitment correctly observed that she "do[es not] have authority to modify a court order."

20

expect counsel (who attended the hearing documented in the minute entry) to wait a couple of days before counsel is served with a minute entry. It would, however, produce an absurd result if we interpreted this rule to mean that the Clerk may provide the Jail with a minute entry documenting a court's commitment order *after* a sentence is actually scheduled to commence, effectively nullifying the court-ordered commencement date. We construe, interpret and apply the law so as to avoid absurd results. *Marriage of Syverson* (1997), 281 Mont. 1, 19, 931 P.2d 691, 702. Accordingly, we reject the District Court's suggestion that the local rule governing service of minute entries on attorneys somehow excuses the County's dilatory transmittal of the written order of commitment to the Jail. Regardless, it does not affect the general rule that the oral pronouncement of a sentence provides legal authority by which to incarcerate a defendant.

## C. Common Law Duty:

¶34 In *Lopez*, we held that a prerelease center owes a "custodial duty" to prevent inmates with whom it had a "special relationship of custody" from harming certain members of the general public. ¶¶ 18-26; *see also* Restatement (Second) Torts, § 302B, cmt. e and situation F (1965) (noting that a reasonable man can assume a "special responsibility" towards another such that he "is required to anticipate and guard against the intentional, or even criminal, misconduct of others." For example, such a duty arises when one "has taken charge or assumed control of a person whom he knows to be peculiarly likely to inflict intentional harm upon others"). In the absence of foreseeability, there is no duty; thus, the prerelease center owed a duty only to

21

foreseeable plaintiffs. *Lopez*, ¶¶ 26-28; *LaTray* ¶ 24. This duty extends to all "members of the general public who would be placed within the foreseeable zone of risk created by the negligent supervision of a [defendant's custodial charge]." *Lopez*, ¶ 26. Thus, to determine whether the County owed Prindel a duty to protect him from harm by Russell we must first consider whether a "special relationship of custody" existed between Russell and the County. If so, we must then ascertain whether Prindel qualifies as a foreseeable plaintiff.

**i. Custodial Relationship:**

¶35    The District Court reasoned that because the Jail never actually took physical custody of Russell, no special relationship ever formed that would give rise to a duty to protect Prindel from Russell's subsequent violent outburst. The court's rationale, however, ignores the definition of custody that this Court has repeatedly adopted when considering whether a custodial relationship exists that gives rise to a duty. The legislature has not defined "custody" in the context of a prisoner, so we have adopted the following definition of custody: "[d]etention; charge; control; possession. The term . . . may mean actual imprisonment . . . or *mere power, legal or physical, of imprisoning or taking manual possession*." *Starkenburg v. State* (1997), 282 Mont. 1, 16, 934 P.2d 1018, 1027 (quoting Black's Law Dictionary, 460 (1968)) (emphasis added); *see also Nelson*, ¶ 28 (defining custody as "immediate charge and control . . . actual imprisonment or physical detention or *mere power, legal or physical, of imprisoning or taking manual possession*" (emphasis added) (quotations and citation omitted)). This definition is

22

consistent with our determination that a "special relationship of custody"—giving rise to a legal duty of care—existed between an inmate and the prerelease facility from which he absconded and that this relationship and consequent duty persisted for several days after the facility lost actual, physical custody of him. *Lopez*, ¶¶ 13, 31.

¶36   We have already determined that the court's order of commitment of December 23, 1998, constituted competent authority under § 7-32-2205, MCA. Accordingly, on December 28, 1998, the Jail had legal authority to imprison Russell notwithstanding the staff's ignorance of that authority. Therefore, for purposes of establishing a special relationship, the Jail took custody and assumed control of Russell on December 28, 1998. Despite relinquishing physical control over him, the County retained custody of Russell through the early morning hours of December 30, 1998, when Russell harmed Prindel. Consequently, the County cannot avoid liability for Prindel's injuries by invoking the principle that "there generally is no duty to protect others against harm from third persons." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 56, at 385 (5th ed. 1984). Because the County entered into a custodial relationship with Russell, it owed a special duty to certain citizens to protect them from a foreseeable risk of harm at the hands of Russell.

¶37   In determining whether a defendant owes a duty of care to a plaintiff, we also weigh the "policy considerations for and against the imposition of liability." *Jackson*, ¶ 38 (quoting *Singleton v. L.P. Anderson Supply Co., Inc.* (1997), 284 Mont. 40, 44, 943 P.2d 968, 971). These policy considerations include:

23

(1) the moral blame attached to a defendant's conduct; (2) the prevention of future harm; (3) the extent of the burden placed on the defendant; (4) the consequences to the public of imposing such a duty; and (5) the availability and cost of insurance for the risk involved.

*Jackson*, ¶ 39. Here, the balance of these factors support the imposition of a duty of care on the County. Certainly it is morally culpable to release a purportedly convicted person on an unwitting public without bothering to verify whether he had in fact been convicted, nor ascertaining what offense he had committed. The imposition of a duty will prevent future harm of this sort because it will encourage jail staff to ensure that persons actually committed to prison by legal authority are not set loose simply because verification of the sentence proves momentarily inconvenient. The burden to confirm the validity of commitment orders is minimal. As members of the Jail staff testified, it could be accomplished by a mere telephone call to the Clerk and perhaps a follow-up fax. Finally, the imposition of a duty benefits the public because potentially dangerous and volatile persons who have been adjudged guilty of violating the laws of the state, court orders and conditions of suspended or deferred sentences will less frequently remain free to perpetrate harm. Moreover, the public suffers no significant detriment if a person who reports to a jail to serve time—but who has not actually been committed to prison by a court—must remain at the jail while the staff confirms the absence of an order of commitment.

**ii. Foreseeability:**

¶38     Having confirmed that a special custodial relationship existed between the County and Russell, which imposed a duty upon the County to protect certain third persons from

24

Russell and that policy considerations support the imposition of a duty of care on the County, we must now consider whether Russell posed a foreseeable risk and whether Prindel qualifies as a foreseeable plaintiff. In other words, was it foreseeable that Russell posed a risk, and was Prindel within the "foreseeable zone of risk" created by the Jail's failure to incarcerate and properly supervise Russell?

¶39    We have long held that foreseeability is of primary importance in establishing the existence of a duty. *See, e.g., Mang v. Eliasson* (1969), 153 Mont. 431, 437, 458 P.2d 777, 781. Thus, "[i]f a reasonably prudent defendant can foresee neither any danger of direct injury nor any risk from an intervening cause he is simply not negligent." *Busta v. Columbus Hospital Corp.* (1996), 276 Mont. 342, 362, 916 P.2d 122, 134 (quoting *Mang*, 153 Mont. at 437, 458 P.2d at 781). The particular accident that ensues, however, need not be foreseen. *Ekwortzel v. Parker* (1971), 156 Mont. 477, 483, 482 P.2d 559, 562-63. In *Lopez*, we held that the Great Falls Pre-Release Center owed a duty of reasonable care to protect community members from being harmed by an inmate in its custody, notwithstanding the fact that he had been incarcerated for non-violent property offenses. *Lopez*, ¶¶ 5, 31. That holding reflects our implicit conclusion that a reasonably prudent defendant should foresee the risk inherent in inadequately supervising or controlling an inmate—since the inmate, when allowed to roam free may intentionally injure a member of the public in their person or property. While a reasonably prudent defendant may not foresee that such an unfettered prisoner would travel from Montana to Mongolia, for instance, and wreak havoc on unsuspecting foreigners, it is not beyond the bounds of

25

reason to anticipate that he or she might cause trouble within the immediate vicinity of the facility where he or she ought to be confined. Thus, we explained that the prerelease center charged with legal custody of the prisoner:

> owed a duty of reasonable care to *all those persons present within the area to which [that prisoner] could reasonably and foreseeably have access during his period of freedom*. That class of persons clearly encompasses Lopez, who resided relatively near to the Center in Great Falls. . . . [T]he Center clearly owed nearby residents, like Lopez, a legal duty of care . . . .

*Lopez*, ¶ 31 (emphasis added).

¶40   Here, we conclude that the County, by and through the Jail, could have foreseen that Russell, if left free to roam, would somehow harm Prindel or others. The court had revoked Russell's suspended sentence and ordered that Russell serve time in prison because Russell admitted to engaging in disorderly conduct while intoxicated. During the week preceding the dawn of a New Year, anybody with a modicum of common sense and rudimentary knowledge of Russell's substance abuse history should have expected, let alone foreseen the possibility, that he would consume intoxicants. Moreover, based on his recent criminal conduct—engaging in disorderly conduct and assaulting his neighbor, allegedly with a gun—one could reasonably anticipate that he might become disorderly, confrontational, and perhaps even aggressively violent while intoxicated. While the record does not indicate that the Jail staff knew anything of Russell's recent criminal conduct, it does reflect that McCawley and Anderson were familiar with Russell and both knew that Russell had previously threatened a fellow inmate. McCawley, who witnessed Russell's threats toward another prisoner first-hand, had actually seen Russell

26

display emotional volatility and aggression while previously imprisoned. The County contends that the Jail staff did not know anything of Russell's criminal past—his several felony convictions, some for violent crimes—at the time when they turned him away and thus could not have anticipated his, arguably unprecedented, violent outburst. This overlooks their avowed knowledge of his threats to a fellow inmate. Furthermore, if the Jail staff lacked knowledge of Russell's proclivity for violence, this was a natural consequence of their complete failure to make any inquiries concerning Russell's claim that he had been ordered by the court to serve time in the Jail. McCawley's testimony reveals that the Jail staff had online access to Russell's criminal history.

¶41 The Jail staff had access to information that would inform them that Russell posed a potential risk to the community if left unsupervised and given unrestricted access to intoxicants. Yet, nobody bothered to look at this information before turning Russell away, just as nobody bothered to check whether the court had in fact ordered Russell committed to their custody on the morning of December 28, 1998. We do not condone such willful ignorance and will not encourage it. A defendant who has information readily available to him or her that would inform him or her of the foreseeable risk of a particular course of conduct, but chooses to act impulsively, without first making an informed calculation of risk, is not a "reasonably prudent defendant." Accordingly, one who makes decisions while blinded by a veil of self-imposed ignorance may not later invoke the unforeseeability of an otherwise reasonably ascertainable risk to defeat the existence of a duty. Nor may she avail herself of the benefit of information that she

27

chose to ignore when pursuing that risky course of conduct. Thus, the County may not utilize Russell's actual criminal history to downplay his propensity for violence and argue that his later crime was not foreseeable. As far as the Jail staff knew (or cared), he could have been a convicted sex offender serving time for violating a term of a suspended sentence that ordered him to steer clear of schools. As Anderson testified, "[w]e had no idea what kind of criminal he was." Absent some effort to ascertain the scope of the risk posed by Russell, the Jail staff should have assumed that he posed the same risk that any unknown convicted criminal might pose. One of the primary purposes behind incarcerating criminal offenders is to "protect the public [and] reduce crime." Section 46-18-101(2)(b), MCA. It is foreseeable that if a convicted criminal is not incarcerated as ordered and is left to his own devices, he will commit additional crimes and injure members of the community in the process.

¶42    Finally, we note that Russell stabbed Prindel at a private residence within ten blocks of the Jail. Prindel resided within Ravalli County. Although the record does not reveal exactly where Prindel resided, his presence in such proximity to the Jail brings him well within the foreseeable zone of danger created by the Jail staff's unilateral decision to unleash Russell on the general public and renders him a foreseeable plaintiff. Consequently, the County owed a duty to Prindel to exercise reasonable care to protect him against harm at the hands of Russell.

¶43    The District Court erroneously granted summary judgment in favor of the County on the basis that it owed no duty of care to Prindel. We reverse.

28

**D. Foreseeability in the Context of Causation**

¶44 The County has not properly presented to this Court the issue of whether it is entitled to summary judgment on the issue of causation. Nevertheless, because the County moved the District Court for summary judgment on this basis, it is appropriate that we comment briefly on the issue for the benefit of the District Court and for the sake of judicial economy. "Although foreseeability is generally properly confined to the duty element of negligence under Montana law, where a dispute presents the issue of an intervening act of a third party, as here, we address foreseeability in the proximate cause context as well." *Lopez*, ¶ 32. In the proximate cause context, we consider whether the unforeseeability of an intervening cause (i.e., Russell's intentional criminal act of stabbing Prindel) severs the chain of causation. *Samson v. State*, 2003 MT 133, ¶ 25, 316 Mont. 90, ¶ 25, 69 P.3d 1154, ¶ 25. In order to establish proximate causation, however, "*the specific injury to a plaintiff need not have been foreseen.*" *Samson*, ¶ 26 (quoting *Lacock v. 4B's Restaurants, Inc.* (1996), 277 Mont. 17, 22, 919 P.2d 373, 375-76), *overruling, in part, Lopez*, ¶ 32, and *LaTray*, ¶ 28 (to the extent that those decisions suggested that the specific injury suffered by the plaintiff must be foreseeable).

¶45 "The causal issue of intervening criminal or noncriminal acts normally involves questions of fact which are more properly left to the finder of fact for resolution." *Lopez*, ¶ 34 (quotations and citation omitted). "Thus, it is only *when reasonable minds could reach but one conclusion* that the question of foreseeability may be determined as a

29

matter of law for purposes of summary judgment." *Lopez*, ¶ 35 (quotations and citation omitted).

¶46 In light of our foregoing analysis of the foreseeability of risk posed by Russell, we conclude that reasonable minds could differ as to whether Russell's intentional act of stabbing Prindel was so unforeseeable as to sever the chain of causation. Consequently, this issue of causation should not be decided on summary judgment, but should be resolved by the trier of fact.

*Issue 2: Whether the District Court erred when it declined to order release of records pertaining to Russell compiled or possessed by the Missoula Pre-Release Center.*

¶47 Prindel argues that the District Court abused its discretion when it denied his motion requesting that the court order the Missoula Pre-Release Center (Center) to produce the records it possessed regarding Russell. Prindel notes that during the course of discovery, he became aware that Russell had been kicked out of the Center and posits that the Center's records may be relevant to the question of foreseeability in the context of causation or may at least lead to evidence relevant to this issue. The County responds that district courts enjoy broad discretion in determining whether evidence is relevant and admissible and Prindel has made no showing that the records could have been considered by the Jail staff or influenced their decision to not admit Russell to the Jail. Thus, the County concludes, the court correctly denied Prindel access to the records held by the Center.

¶48 Rule 26(b)(1), M.R.Civ.P., provides that:

30

> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things . . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The scope of discovery extends to documents possessed by non-parties "as provided in Rule 45." Rule 34(c), M.R.Civ.P. Rule 45(a)(3), M.R.Civ.P., in turn, mandates that "[t]he clerk shall issue a subpoena, signed but otherwise in blank, to a party requesting it, who shall complete it before service." Thus, generally, Prindel could have compelled a non-party such as the Center to produce relevant documents simply by subpoenaing those documents through normal discovery procedures, but the District Court could not have compelled a non-party to produce documents pursuant to Rule 37, M.R.Civ.P.

¶49 The records collected and preserved by the Center, however, constitute criminal justice information. Section 44-5-103(8)(a), MCA. Morever, these records qualify as confidential criminal justice information. *See* § 44-5-103(3)(e), MCA (defining as confidential criminal justice information any criminal justice information "not clearly defined as public criminal justice information"). Consequently, Prindel could not gain access to the files compiled by the Center absent authorization from the District Court "upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure." Section 44-5-303(1), MCA.

¶50 It is difficult to discern the legal basis for Prindel's motion from his brief on appeal. Nevertheless, his motion, titled "Motion for Order Directing Release of Criminal

Justice Information," seeks the release of such information. Consequently, we conclude that Prindel has, pursuant to § 44-5-303, MCA, requested that the court authorize the Center to release confidential criminal justice information contained in its files.

¶51 The District Court denied Prindel's motion because "this information was not within the purview of the jail staff (and most likely not in the purview of the County) prior to Russell's Pre-Sentence Investigation Report, and therefore could not have had a bearing on the foreseeability of Russell's act of violence against Prindel." The court essentially decided, without the court or either party ever seeing the information contained in the Center's files, that this information was not relevant.

¶52 "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid. While all relevant evidence is admissible, non-relevant evidence is not admissible. Rule 402, M.R.Evid. Thus, had the District Court been ruling on a motion seeking to admit the Center's files as evidence, a proper determination that the files lacked relevance would have provided a valid basis for exclusion. Prindel's motion, however, was not a motion seeking a ruling on admissibility, but a motion requesting that the court order release of confidential criminal justice information under the Criminal Justice Information Act. The Criminal Justice Information Act sets forth the criteria that a district court should employ when considering a motion for release of criminal justice information. *See* § 44-5-303(1), MCA ("dissemination of confidential criminal justice information is restricted to . . .

32

those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure"). Rather than engaging in the statutorily mandated balancing of competing concerns, the District Court impermissibly conjectured that the information contained in those files was unknown to the County before Russell stabbed Prindel. The District Court assumed too much regarding the County's ignorance of the Center's files. Information in the Center's files may indicate that Prindel came there from Ravalli County, or was sent to a Ravalli County facility after being kicked out of the Center. This would have a bearing on what the County knew or should have known about Russell. The District Court effectively ruled on a non-existent motion *in limine* to exclude the contents of documents that were not in possession of the court or either of the parties. By ignoring the statutory criteria and denying access to the Center's records on the conjectural basis that such records are not relevant, the District Court abused its discretion.

¶53    We now turn to whether the "demands of individual privacy" "clearly exceed the merits of public disclosure." Section 44-5-303(1), MCA. Pursuant to § 44-3-303(3), MCA, Prindel would be responsible for maintaining the confidentiality of any criminal justice information that he might receive. Thus, unless that information is admitted at trial, it will never become truly "public" information. To be admitted at trial, such information must be relevant to an issue in the case. Rule 402, M.R.Evid. The record does not reflect that Russell has asserted his privacy rights by opposing the disclosure of these records. Moreover, any such assertions of privacy would be undermined by the fact

33

that Russell is currently serving a *life* sentence at the Montana State Prison for deliberate attempted homicide and that his victim seeks the records in order to obtain legal redress. Any diminution of Russell's standing in the community caused by revelation of his conduct at the Center will be forever overshadowed by the fact that he once attempted to kill Prindel. In light of the foregoing analysis, we conclude that the demands of individual privacy do not clearly outweigh the merits of disclosing to Prindel the Center's records pertaining to Russell.

¶54 Though ostensibly ruling on Prindel's motion seeking the release of criminal justice information compiled and possessed by the Center, the District Court justified denying Prindel access to this information because the information is not relevant. The District Court effectively ruled that this evidence is not admissible under Rule 402, M.R.Evid. Relevance is not required for the release of criminal justice information. Moreover, information need not be relevant in order to be discoverable, but need only be reasonably calculated to lead to the discovery of relevant information. As demonstrated above, the Center's files are reasonably calculated to lead to the discovery of relevant information. Therefore, we reverse the District Court's denial of Prindel's motion.

*Issue 3: Whether the District Court erred when it failed to compel production of the Ravalli County Attorney's files concerning Russell.*

¶55 According to Prindel, in response to the District Court's order requiring the County Attorney to produce "[a]ll files and records concerning Richard Russell," the County Attorney produced some records but specifically declined to produce "work

34

product, notes, correspondence and things of that nature" unless specifically ordered to do so by the District Court. In the District Court, the County argued simply that Prindel had requested only criminal justice information from the County Attorney and that work product and notes do not constitute criminal justice information under § 44-5-103(8), MCA. The District Court later completed an *in camera* review of the files and records that had not been produced—presumably to ascertain which of them contained work product and other privileged information—and expressed concern over only one of these documents: a letter written by the County Attorney after Russell stabbed Prindel. The court found that this letter "is colored by hindsight," and denied Prindel's motion to compel production of additional files possessed by the County Attorney.

¶56 Prindel argues that the District Court erred when it declined to issue an order compelling production of all of the Ravalli County Attorney's files concerning Russell, despite having issued two previous orders to produce such files. Prindel notes that the court's second order related to more than just criminal justice information and ordered the County Attorney to produce all of his files concerning Russell. The County argues that Prindel sought the County Attorney's files through an order to release criminal justice information under § 44-5-303, MCA, rather than by way of a request for discovery. The County maintains that the District Court properly exercised its discretion when it determined, after an *in camera* review, that the requested files, with the exception of one letter, were not relevant. As to that letter, the County contends that the District Court properly determined that it was colored by hindsight, and therefore not relevant.

35

¶57 The County's contention—that Prindel sought access to the County Attorney's files only through an order to release criminal justice information under § 44-5-303, MCA, and not via a discovery request—lacks merit. After Prindel initially requested access to the criminal justice information regarding Russell contained in the County Attorney's files, specifically "excluding attorney work product and any other information otherwise privileged," the parties jointly filed a second motion, indicating that Prindel would need "additional information . . . to properly prepare his case." The court then ordered the County Attorney to release "[a]ll files and records concerning Richard Russell." The court order, in stating that "to the extent applicable," the requirements for disclosure under § 44-5-303, MCA, have been met, contemplates production of more than just the criminal justice information contained in the County Attorney's files. Even if the request had been limited to criminal justice information, this would not necessarily exclude letters, notes and memos prepared by the County Attorney. *See* § 44-5-103(8), MCA (defining "criminal justice information" as "information relating to criminal justice collected, processed, or preserved by a criminal justice agency" but excluding the administrative records of a criminal justice agency). The sole letter "flagged" by the court communicates the County Attorney's understanding of Russell's assault against his neighbors. Thus, it qualifies as information collected and processed by a criminal justice agency. Without viewing the remaining files—which, as a result of the District Court's ruling, are not included in the record on appeal—we cannot say whether or not they constitute criminal justice information.

36

¶58 To the extent that Prindel's request covered criminal justice information, the District Court should have weighed the demands of individual privacy against the merits of public disclosure. *See* § 44-5-303(1), MCA. As with the records compiled by the Center, the District Court should have ordered release of the County Attorney's files, excepting those individual files that failed to satisfy the statutory criteria. The District Court abused its discretion when it declined to order release of the County Attorney's files containing criminal justice information.

¶59 To the extent that Prindel's request covered more than criminal justice information, it is governed by the rules of discovery. A party may obtain discovery of information that is relevant or that appears "reasonably calculated to lead to the discovery" of relevant information. Rule 26(b)(1), M.R.Civ.P. Rule 34, M.R.Civ.P., provides that a party may serve on another party a request to produce designated documents. A party's failure to "serve a written response to a request for inspection submitted under Rule 34, after proper service of the request" "may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 26(c)." Rule 37(d), M.R.Civ.P.

¶60 Prindel properly served a request for inspection of "[a]ll files and records concerning Richard Russell," under Rule 34, M.R.Civ.P. The County did not apply for a protective order pursuant to Rule 26(c), M.R.Civ.P. The County also did not serve a written response to Prindel's request. Its failure to do so, therefore, may not be excused on the grounds that the discovery sought by Prindel is objectionable.

¶61    Without question, the opinion of the prosecutor, a county employee, that Russell had used a handgun and knife when he assaulted his neighbors in 1997 is relevant to what the County knew or should have known about Russell in December 1998. Consequently, this information is relevant to the issue of causation. Moreover, the County Attorney is listed as a defense witness, so his recorded impression and recollections of the initial criminal case against Russell are doubly relevant, as these may provide means of impeaching him as a witness. Without scrutinizing them, we cannot say whether the other notes, correspondences and work product concerning Russell appear reasonably calculated to lead to the discovery of relevant information and the District Court never made such a determination. Instead, the District Court's order reflects an implicit conclusion that because the County Attorney's letter "is colored by hindsight," it lacks the requisite relevance to be discoverable. The District Court abused its discretion when it determined, *ex parte* and despite the absence of a filed motion requesting such a determination, that the County Attorney's files are not sufficiently relevant to be admitted into evidence. Such error is compounded by the fact that the parties had already stipulated to production of those files.

¶62    Finally, the fact that the withheld documents may contain the County Attorney's work product, should not preclude discovery of these documents. Rule 26(b)(3) provides that a party may obtain discovery of documents prepared for trial "by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's

38

case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Rule 26(b)(3), M.R.Civ.P. Nevertheless, "[a] party may obtain without the required showing a [written and signed or otherwise adopted] statement concerning the action or its subject matter previously made by that party." Rule 26(b)(3), M.R.Civ.P. In applying these limits on the scope of discovery—which are identical to the limits contained in the Federal Rules—many federal courts "have found the work-product privilege unavailable when a prosecutor in a prior criminal investigation later objects to discovery by a litigant in a related and subsequent civil lawsuit." *Ostrowski v. Holem*, 2002 WL 31956039 (N.D.Ill. 2002), *4, and cases cited therein. A person who is neither a party to the litigation in which discovery is sought nor a representative of a party to that litigation may not claim work product immunity. *In Re California Public Utilities Comm'n* (9th Cir. 1989), 892 F.2d 778, 781; *Doubleday v. Ruh* (E.D.Cal. 1993), 149 F.R.D. 601, 605-06 (noting that the People of California, rather than a particular county, is the plaintiff in a criminal prosecution; therefore, the work product of the district attorney may be discovered in a subsequent action against a county). A basic purpose behind the work product privilege is the concern with interfering with an ongoing criminal investigation. *In re Dept. of Investigation of City of New York* (2d Cir. 1988), 856 F.2d 481, 484. When the underlying criminal case has been closed, however, this concern disappears. *Ostrowski*, *4.

¶63 Here, Russell has been convicted of attempted deliberate homicide. He has appealed, and his conviction has been affirmed by this Court. *State v. Russell*, 2001 MT

278, 307 Mont. 322, 37 P.3d 678. Thus, the criminal case against Russell has been closed by the County Attorney and we assume, absent evidence to the contrary, that any preceding prosecutions against Russell have likewise been closed. Moreover, the State of Montana was the plaintiff in the prosecutions of Russell, for the stabbing and for the assault against his neighbors, though these cases were handled by the Ravalli County Attorney on behalf of its client, the State. Accordingly, Prindel should have access to the County Attorney's files regarding Russell, including the County Attorney's work product. On remand, the District Court should protect against disclosure of opinion work product prepared in anticipation of the present litigation with Prindel. *See Palmer v. Farmers Insurance* (1993), 261 Mont. 91, 117, 861 P.2d 895, 911, (distinguishing between ordinary and opinion work product and allowing disclosure of opinion work product only if the "mental impression is *directly at issue* in the case and the need for the material is compelling"); *see also* Rule 26(b)(3), M.R.Civ.P. ("the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation [in which discovery is sought]").

¶64     In evaluating Prindel's request for access to the County Attorney's files regarding Russell, the District Court failed to apply any of the relevant rules or statutory criteria. It did not ascertain whether the demands of individual privacy clearly exceed the merits of public disclosure of criminal justice information contained in the withheld files. It did not conclude that the information contained in the withheld files was not reasonably

calculated to lead to discoverable information. Finally, it did not determine that Rule 26(b)(3), M.R.Civ.P., precludes discovery of any work product contained in the withheld files. Instead, it made an ad hoc, *ex parte* assessment of the relevance of the contents of the files themselves and decided that they were not relevant, and so would not be admissible. The District Court thereby abused its discretion by wrongly employing the admissibility standard in lieu of criminal justice information, discovery, or work product standards. We reverse.

## CONCLUSION

¶65 As a matter of law, on December 30, 1998, the County owed a duty of care to Prindel to protect him from harm at the hands of Russell, with whom it had entered into a custodial relationship. The District Court improperly determined that no such duty existed. Although Russell's act of stabbing Prindel was an intervening cause, it was not so unforeseeable that it breaks the chain of proximate causation as a matter of law. The issue of causation should be submitted to a jury for determination.

¶66 The District Court abused its discretion when it refused to order the release of the files concerning Russell compiled and possessed by the Missoula Pre-Release Center. The District Court likewise abused its discretion when it denied Prindel's request that it order the County Attorney to produce all files concerning Russell.

¶67 We reverse and remand for further proceedings consistent with this Court's opinion.

/S/ W. WILLIAM LEAPHART

41

We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE